APR 10 2026 PM2:35
FILED – USDC – BPT – C

**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**

Dr. Natalie Levitt,

Plaintiff,

v.                                        Civil Action No. _____


Robert Tyghter-Twigg, individually and in his official capacity;

Justin Roselle, individually and in his official capacity;

Christopher Festa, individually and in his official capacity;

Kelli Reynolds, individually and in her official capacity;

Jillian Moller, individually and in her official capacity;

Emily Guerra, individually and in her official capacity;

Christopher Terrell, individually and in his official capacity;

Richard Conklin, individually and in his official capacity;

Tim Shaw, individually and in his official capacity;

Michael Fedele, individually and in his official capacity;

Burt Rosenberg, individually and in his official capacity;

City of Stamford,

Defendants.


## COMPLAINT

(42 U.S.C. § 1983)

## I. INTRODUCTION

1. This action arises from Defendants' warrantless entry into Plaintiff's home, seizure without probable cause or lawful basis, use of unreasonable force, unlawful and degrading search, retaliatory arrest, and malicious prosecution in violation of the Fourth and First Amendments.

2. Defendants acted without exigent circumstances, without conducting a reasonable evaluation and without considering readily available evidence, resulting in the unlawful arrest and prosecution of Plaintiff.

3. Defendants intentionally suppressed evidence that would have immediately exonerated and vindicated Plaintiff, but has abundant incriminating evidence reflecting coordinated misconduct.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## III. PARTIES

6. Plaintiff, Dr. Natalie Levitt, is a resident of Connecticut.

7. Defendants Tyghter-Twigg, Roselle, Festa, Reynolds, Moller, and Guerra were at all relevant times sworn police officers employed by the City of Stamford Police Department and acted under color of law.

8. Defendant Christopher Terrell was at all relevant times sworn police officer employed by the City of Stamford Police Department and had prior direct involvement with Plaintiff's complaints dating back to April 24, 2022

9. Defendant Richard Conklin was at all relevant times a sworn police officer employed by the City of Stamford Police Department, served as Assistant Chief of Police, and had supervisory authority over the officers involved in the events described herein. Defendant Conklin had prior involvement with complaints made by Plaintiff regarding harassment and intimidation dating back to July 27, 2022 and failed to take corrective action.

10. Defendant Tim Shaw was at all relevant times the Chief of Police for the City of Stamford Police Department and had supervisory authority over the officers involved in the events described herein.

11. Defendant Michael Fedele was at all relevant times the Chair of the Police Commission for the City of Stamford and a policymaker for the Stamford Police Department, with supervisory and policy-setting authority over the matters described herein. Defendant Fedele also served at all relevant times as a trustee of the police pension fund and as Chair of the Anti-Blight Committee and acted under color of law in all above mentioned capacities.

12. Defendant Burt Rosenberg was at all relevant times an Assistant Corporation Counsel for the City of Stamford. He acted under color of state law in connection with the handling of Plaintiff's Freedom of Information request for police body-worn camera footage.

13. Defendant City of Stamford is responsible for policies, training, supervision, and discipline.

## IV.  FACTUAL ALLEGATIONS

14. Prior to April 11, 2023, Plaintiff repeatedly reported ongoing harassment, misconduct, and safety concerns to law enforcement and municipal officials.

15. Plaintiff communicated directly to police, as well as Mayor and provided documented evidence of ongoing, relentless, and retaliatory harassment and intimidation directed at her, including repeated conduct that was abusive, instigating, and taunting in nature.

16. These communications were acknowledged, yet no meaningful intervention or protection was provided.

17. At the time of that report, Plaintiff had already shown and provided supportive Ring security videos and other audio-visual evidence to SPD and Defendant Terrell documenting the reported harassment, abuse, and retaliatory conduct. Despite this evidence, SPD, through its official Records Retention function, formally characterized Plaintiff's allegations as "unsubstantiated."

18. In June 2022, Plaintiff submitted Ring security camera video links, videos, and photographic evidence via email to SPD retention and requested that the report be corrected to reflect the documented harassment, abuse, and retaliatory conduct. SPD, through its official Records Retention response, declined to amend the report, directed Plaintiff back to the investigating officer, and stated that nothing further would be done.

19. The "unsubstantiated allegations" designation was issued as an official SPD determination despite abundant evidence provided by Plaintiff, was never corrected, and no meaningful enforcement actions were taken against the identified aggressor, allowing the harassment and retaliatory conduct to continue and escalate.

20. Despite knowledge of ongoing issues, no enforcement actions were taken and no protective measures were implemented, reflecting deliberate indifference and intentional cover-up.

21. Instead, in 2024, a deliberate, libelous, and unlawful 'Emotionally Disturbed Person (EDP)' label was deliberately inserted without factual or medical basis and left uncorrected despite Plaintiff's written request to correct it, setting Plaintiff up for false mental health accusations.

22. This classification, knowingly and intentionally left uncorrected, biased responding officers and facilitated further unhinged emotional, verbal, and psychological abuse by neighbor aggressor Frank J. Santorella and his co-conspirator Maria Forte-DeMott, while serving as a pretense and justification for abuse by law enforcement.

23. On July 27, 2022, and thereafter, Plaintiff contacted Defendant Conklin, then a Captain in the Stamford Police Department, to report a credible threat involving an individual Plaintiff believed had been sent by the Santorellas to Plaintiff's home to intimidate or harm her. On or about July 18, 2022, the individual, described as an Albanian man in his sixties, followed Plaintiff in a vehicle that Defendant Conklin determined was not registered to him, then turned around and began taking photographs of Plaintiff as she exited her garage and proceeded toward her front door. Plaintiff approached and confronted the individual and obtained and preserved photographic evidence of the encounter, which she provided to Defendant Conklin. Defendant Conklin initially commenced an investigation based on the evidence provided and concurred with Plaintiff's assessment. However, shortly thereafter, Defendant Conklin abruptly ceased the investigation and dismissed Plaintiff's concerns, making dismissive and mocking statements, including, "What do you want me to do, call the FBI?", referring to Plaintiff as "a cat of a different kind," and stating, "If something happens to you, I promise you, I will then conduct the most thorough investigation." During the same interaction, Defendant Conklin informed Plaintiff that he had been promoted to Assistant Chief of Police.

24. On April 11, 2023, the accusers, Frank J. Santorella (Santorella Jr.) and his father, Frank A. Santorella (Santorella Sr.), trespassed onto Plaintiff's property—as later confirmed by a survey performed by land surveyor firm Edward J. Frattaroli, Inc. on 9/6/2023 and paid by Plaintiff. The accusers moved Plaintiff's garbage cans out of their way, and began digging along their imagined property line, relying solely on a general plot map and without a legitimate survey and survey stake-out, to install a spite fence that encroached onto Plaintiff's and beyond any lawful boundary onto City property, nearly into the public street, with the intent to prevent Plaintiff's use of that City property for garbage pickup. From that date on through Plaintiff's departure following forced sale of her only home on December 15, 2025, the City took no action to address or remove this encroachment despite being informed, reflecting deliberate indifference.

25.  When Plaintiff exited her residence and began recording the trespassing, she asked the accusers repeatedly to leave her property and stop trespassing. In response, Santorella Sr. repeatedly refused claiming it was his property despite lack of proper survey stake outs and then he got angry throwing one of Plaintiff's garbage cans approximately eight feet away into the middle of the city street (confirmed by him on BWC), and forcefully shoved another, larger can toward Plaintiff.  Plaintiff retrieved the displaced can on her property and attempted to return it to its prior position on her property, while again asking Santorella Sr. to leave her property. Instead he refused continuously, leaning on Plaintiff's property, while Santorella Jr. continued recording on his phone, mocking, taunting and harassing the Plaintiff. This conduct was not isolated, but part of a continuous and ongoing pattern that had persisted for over a year at that time, beginning on or about February 24, 2022, when Santorella Jr. moved into his parents' rental property at 11 Burwood Avenue, Stamford, Connecticut, after his spouse, with whom he has

three underage children, filed for divorce. Santorella's rental property neighbors Plaintiff's property, where at that time Plaintiff had lived peacefully for nearly fourteen years.

26. The accusers continued to refuse to leave Plaintiff's property. At the time, Plaintiff's garbage cans were located on her property, with a coiled barbed wire placed in front of them as a protective measure to prevent animal intrusion. After trespassing onto Plaintiff's property and moving the garbage cans without permission, Santorella Sr. stood in that same area where the cans had been positioned, with the barbed wire present on the ground. During the exchange, he appeared to lose his footing.

27. Within seconds, Santorella Sr. regained his footing, advanced toward Plaintiff, forcefully shoved Plaintiff's garbage can toward her again, and directed profanities, including 'you crazy son of a bitch with your barbed wire,' while lifting the barbed wire from the ground and throwing it onto Plaintiff's property.

28. Santorella Jr. immediately called police and falsely stated that Plaintiff 'threw his 72-year-old father to the ground.' Furthermore, despite Santorella Sr. explicitly stating that he was 'okay' and did not need an ambulance, Santorella Jr. nevertheless requested one, stating to police: 'bring one over—I mean it might help just to file a police report".

29. Santorella Jr. then resumed digging, laughing, while signaling to Maria Forte-DeMott, his childhood neighbor friend and accomplice, who was positioned at her window and appeared to be waiting to be called upon, to come out and act as a witness, calling out to her multiple times, including, 'You got that, Maria?!—cops are coming—she pushed my father to the ground,' and then 'Maria, you saw it out the window, right?! Maria, you saw her doing it out the window too, right?"

30. Santorella Sr. continued arguing with Plaintiff and refused to leave her property, while Santorella Jr. continued digging, laughing, and mocking Plaintiff, including stating to Santorella Sr., 'it's an assault on a senior citizen,' and directing at Plaintiff, while laughing, 'you had your day in court and you failed,' referencing Plaintiff's protective order application filed against Santorella Jr. in Stamford Superior Court approximately three weeks prior to this incident. The protective order was denied despite Plaintiff's submission of abundant contemporaneous evidence of ongoing abuse and harassment by Santorella Jr. The conduct described herein followed immediately thereafter and appeared retaliatory in nature, as evidenced by the timing, the statements described above, and Santorella Jr.'s pattern of conduct toward Plaintiff before and after the incident described herein, spanning a four-year period, culminating in Plaintiff's forced relocation from her only home as a direct result of the ongoing pattern of dangerous, malicious, vindictive and retaliatory conduct described herein, making Plaintiff fear for her safety.

31. After Santorella Jr. called police, the accusers resumed digging. Plaintiff recorded the positions and surroundings for the record and then returned inside her home, waiting to speak with police to address harassment and trespassing issues and present her approximately ten-minute audio-video recording of the incident.

32. Shortly thereafter, Defendant Officers Robert Tyghter-Twigg, Justin Roselle, and Christopher Festa responded to a complaint made by Santorella Jr. and Santorella Sr., while Maria Forte-DeMott emerged upon Santorella Jr.'s prompting, presented herself as a witness, and provided statements that instigated and amplified his false account.

33. Prior to engaging Plaintiff, Defendant Officers Tyghter-Twigg, Roselle, and Festa briefly spoke with Santorella Jr., Santorella Sr., and Maria Forte-DeMott, and appeared to form a preconceived conclusion adverse to Plaintiff without conducting an independent evaluation of the facts at the scene or reviewing available evidence.

34. Plaintiff voluntarily opened her door and stood in the doorway, ready and willing to speak with the peace officers and provide evidence in her possession regarding the incident.

35. Defendant Tyghter-Twigg requested that he and the other officers enter Plaintiff's home; Plaintiff expressly refused consent without hesitation, remaining in the doorway ready to discuss the incident and provide evidence. At that time, Plaintiff of a petite frame was alone inside her home and was confronted at her doorway by three strong armed officers.

36. Without warning, Defendant Tyghter-Twigg reached across the threshold, stepped into Plaintiff's home without permission, grabbed Plaintiff's right forearm, forcibly twisted her arm behind her back, and seized her at the doorway, forcibly pulling her from the threshold onto the exterior staircase leading to the front door.

37. Defendant Tyghter-Twigg used continuously profane and commanding language, including, "Step out of the fucking house..", "Don't you fuck now...", "You don't fucking go ahead and make fucking decisions here... OK. "

38. Defendants Roselle and Festa immediately joined in, and the three officers forcefully restrained and handcuffed Plaintiff against her will, without probable cause, a warrant, or lawful justification, in an ambush-like manner.

39. When Plaintiff finally realized that she has been handcuffed and restrained against her will in her own home without lawful justification or probable cause, she immediately requested an

attorney, stating, "Let me call my lawyer" to which Defendant Tyghter-Twigg responded, "You are not calling your fucking lawyer," and continued in a dismissive and profane manner.

40. Plaintiff was devastated in disbelief asking:"Are you kidding me?? Is this justice?!" To which Tyghter-Twigg responded:"Stop... Stop... I asked you if we could come in and talk!...".

41. Defendants denied Plaintiff access to counsel. Defendants did not advise Plaintiff of her Miranda rights prior to or during custodial questioning. This interaction was recorded on Plaintiff's home security system and on Defendants' body-worn cameras.

42. Plaintiff, a licensed veterinarian, a well-respected professional and member of the community, a petite, unarmed single woman and Ukrainian immigrant, with no prior arrests or any history of involvement with law enforcement over more than five decades of her life across multiple countries, was seized and arrested for the first time in her entire life in her own home by three armed peace officers, without a warrant, without probable cause, and without lawful justification.

43. No exigent circumstances existed to justify the entry or arrest.

44. The officers acted in the absence of any immediate threat or emergency and without any evaluation of the facts at the scene, reflecting a predetermined decision to arrest Plaintiff.

45. Defendant Officers arrested Plaintiff without a warrant, without probable cause, and without lawful justification.

46. In doing so, Defendant Officers disregarded Plaintiff, denied her any opportunity to provide statements or present readily available audio-video evidence of the incident, including an approximately ten-minute contemporaneous recording, and proceeded without any attempt to assess the scene or the facts and evidence.

47. The warrantless entry into Plaintiff's home and the seizure and arrest of Plaintiff were conducted in violation of Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution, including her right to due process of law.

48. Plaintiff possessed clear evidence that Santorella Jr. and Santorella Sr. were the aggressors, having trespassed onto her property without permission, engaged in aggressive conduct towards Plaintiff and refused to leave despite multiple requests.

49. This incident followed a prolonged pattern of trespassing, taunting, and harassment directed at Plaintiff, including the erection of a temporary orange fence along the property line including the erection of a temporary fence along the property line displaying multiple targeted and taunting signage directed at Plaintiff, including statements such as 'No Trespassing — Yes, it's you!,' despite Santorella Jr.'s repeated trespassing onto Plaintiff's property and prior police reports starting with April 24, 2022 documenting such conduct, which the City had failed to address.

50. Despite the visible circumstances at the scene and prior documented incidents reflected in police reports, Defendants made no effort to determine the aggressor or assess the facts before arresting Plaintiff.

51. Instead, Defendants relied solely on the accusers' false statements, despite clear and readily available evidence demonstrating their falsity, and proceeded as though those statements were established fact, without any independent verification.

52. Rather than addressing the misconduct described above or taking any enforcement action against Santorella Sr. and Santorella Jr., Defendant Officers acted with bias against Plaintiff,

disregarded her, denied her the opportunity to present her account and evidence, and instead arrested Plaintiff without a warrant, without probable cause, and without lawful justification, while allowing Santorella Sr. and Santorella Jr. to remain on scene without consequence, demonstrating that the decision to arrest Plaintiff was made irrespective of the facts.

53. During the arrest, Defendant Tyghter-Twigg conducted a forceful search of Plaintiff while she was restrained with her hands handcuffed behind her back, violating her rights under the Fourth Amendment and her right to bodily integrity and due process under the Fourteenth Amendment.

54. After the forceful search, while her hands were handcuffed behind her back and before being shoved into the police vehicle, Plaintiff experienced a sudden, sharp and forceful prick to the inside of her left wrist, consistent with a needle-like puncture. On body-worn camera footage, Plaintiff can be heard repeatedly asking whether she had been tased, audibly distressed and in visible anguish. At the time, Plaintiff was in a state of acute fear and distress, as she has a longstanding medical condition managed with medication, and was concerned that the stress and physical contact could trigger a relapse and adversely affect her health.

55. Following the incident, Plaintiff experienced a relapse of her previously controlled medical condition after more than twenty years of remission, resulting in significant disruption to her health and daily functioning.

56. Defendants' use of force, including the acute needle prick to Plaintiff's left wrist while she was restrained in handcuffs behind her back, caused injury to her wrist resulting in persistent numbness affecting the inner wrist and adjacent palm, radiating toward the thumb and extending up the inner forearm toward the elbow, continuing to the present.

57. During the arrest, while being forcibly shoved into the police vehicle, Plaintiff's right foot became caught in the door frame. Defendants then applied force to push her leg into the vehicle, repeatedly bending it in an unnatural position and causing injury to her right leg.

58. Plaintiff sustained physical injuries as a direct result of Defendants' use of force, including a localized injury to her wrist and injuries to her knee and ankle.

59. Plaintiff did not seek immediate medical evaluation at that time due to the circumstances, including the need to address the injury to her wrist and hand, which are essential to her work as a veterinarian, and the legal consequences arising from Defendants' actions.

60. Plaintiff subsequently developed ongoing symptoms in her right leg, including daily numbness, throbbing pain, and functional impairment affecting the knee and ankle, which have persisted and worsened over time.

61. These symptoms have resulted in daily discomfort and have impaired Plaintiff's ability to walk comfortably and perform her usual activities, including wearing certain footwear, such as heeled shoes, which were a defining aspect of her personal presentation and daily lifestyle prior to the incident.

62. Plaintiff was forcibly dragged in handcuffs in full view of others, including the accusers/ aggressors, subjecting Plaintiff to what was effectively a public 'perp walk,' causing severe humiliation, emotional, psychological, and physical distress, as well as personal and reputational harm and resulting in lasting trauma and ongoing consequences. The accusers/aggressors stood nearby as active participants, openly celebrating and encouraging Plaintiff's public humiliation while watching and recording her on their cell phones.

63. Body-worn camera recordings reflect that Defendant Officers adopted the accusers' statements without independent verification and failed to conduct an objective inquiry.

64. Defendants' actions demonstrate bias and prejudgment and appeared to be premeditated in light of the sequence of events described herein, resulting in Plaintiff being subjected to arrest and prosecution based solely on unverified accusations, while the accusers—who were also the aggressors—were not investigated or held accountable.

65. Plaintiff was transported to the police station and detained against her will for approximately six hours.

66. During her detention, Defendants Moller and Guerra initiated a coercive strip search of Plaintiff. Plaintiff was restrained by being handcuffed by one wrist to a fixed concrete bench and ordered to remove clothing while restrained, leaving her partially undressed. Plaintiff informed Defendants that her undershirt was see-through and requested to retain her outer garment for modesty; Defendants persisted and threatened to cut her garment. Defendants further ordered Plaintiff to remove her jewelry while she was handcuffed to the concrete bench, threatening to remove it themselves if she did not comply.

67. During the strip search, Plaintiff requested to speak with Defendant Conklin. Defendant Moller responded, in substance, "You will, after you do what we want," and the search continued.

68. While in custody, Plaintiff requested an attorney. Defendants denied or ignored that request and proceeded with questioning and processing.

69. Defendants continued questioning after Plaintiff's request for counsel and without counsel present.

70. During the strip search, Defendant Roselle approached Plaintiff and, without consent, removed a hair clip from her hair and demonstratively dropped it on the floor. When Plaintiff objected and questioned his conduct, invoking basic respect, asking whether he had a mother or sister and whether he feared God, Roselle responded, 'I don't believe in that shit."

71. The search occurred in a room with a large window, on full display to others. Defendants Tyghter-Twigg, Roselle, and Festa were present at various times, observing and participating in the conduct. At one point, Defendant Moller called out through the window to Defendant Reynolds, stating, 'Hey, Kell—come join the party!'

72. Defendant Reynolds then entered and zealously participated in the search and related conduct. While Defendants may claim adherence to standard procedure, the manner in which the search was conducted—including its public exposure, coercive execution, and involvement of multiple officers—was excessive, degrading, and conducted in a manner far beyond any legitimate law enforcement necessity. These events were recorded on body-worn camera footage.

73. During the search, Plaintiff's breast was exposed without justification, and the exposure was recorded on body-worn camera footage.

74. Plaintiff did not consent to the search or to the recording of her partially unclothed body.

75. The search and recording were conducted without lawful justification and in a degrading and invasive manner, reflecting an abuse of authority.

76. Defendants failed to take reasonable steps to preserve Plaintiff's privacy or dignity during the search and recording.

77. The recording created a permanent record of the intrusion, compounding the severity of the violation and its lasting impact on Plaintiff."

78. The recording of Plaintiff's exposed body during a non-consensual search constituted an unwarranted invasion of personal privacy and was inconsistent with governing standards for body-worn camera use, including Connecticut General Statutes § 29-6d.

79. As a direct and proximate result of Defendants' conduct, Plaintiff suffered severe humiliation, emotional distress, mental anguish, and physical harm, including lasting psychological trauma. The trauma precipitated a relapse of a chronic medical condition that had been in remission for approximately twenty years with treatment. Prolonged, severe chronic stress is a well-recognized medical trigger for relapse and exacerbation of serious conditions. Since the incident, Plaintiff has experienced persistent symptoms triggered by ongoing high stress, significantly impairing her daily functioning and ability to safely perform critical professional duties, including driving and performing surgical procedures, and causing permanent and ongoing harm to her health and future.

80. Following the incident, Plaintiff was charged with criminal offenses arising from the same unlawful conduct described herein.

81. On November 21, 2024, the State's Attorney's Office dismissed all charges against Plaintiff.

82. The dismissal was not the result of any plea agreement, diversionary program, or compromise.

83. Defendants acted within a chain of command and pursuant to municipal policies, practices, or customs.

84. The City of Stamford failed to adequately train, supervise, and discipline its officers despite known or obvious risks of constitutional violations, and authorized, condoned, or acquiesced in

the unlawful arrest and related misconduct, including retaliatory conduct by those in positions of authority.

85. These failures constitute deliberate indifference to Plaintiff's constitutional rights and reflect a pattern or practice of similar misconduct and retaliation.

86. At all relevant times, Defendants acted under color of state law and within the scope of their employment with the City of Stamford and its Police Department.

87. The acts and omissions described herein were undertaken intentionally, willfully, maliciously, and/or with reckless disregard for Plaintiff's clearly established constitutional rights.

89. Defendants knew or reasonably should have known that their conduct violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

90. The unlawful entry, seizure, detention, and search of Plaintiff were conducted without a warrant, without probable cause, and without exigent circumstances.

91. The force used against Plaintiff was objectively unreasonable under the circumstances and excessive in relation to any legitimate law enforcement purpose.

92. The strip search and exposure of Plaintiff's body were conducted in a manner that was degrading, unnecessary, and unrelated to any legitimate penological or safety interest.

93. The recording of Plaintiff's exposed body on body-worn camera constituted an additional and independent intrusion upon Plaintiff's privacy and bodily integrity.

94. At no point did Plaintiff provide voluntary, informed consent to the search, the exposure, or the recording.

95. Defendants failed to take reasonable steps to protect Plaintiff's privacy despite having the opportunity and obligation to do so.

96. The conduct of Defendants was not an isolated incident but was carried out in the presence of, with the knowledge of, and/or with the acquiescence of other officers.

97. Defendants Tyghter-Twigg, Roselle, Festa, Moller, and Reynolds directly participated in, observed, and/or failed to intervene to prevent the unlawful conduct.

98. Each Defendant had a realistic opportunity to intervene and prevent or mitigate the constitutional violations but failed to do so.

99. The actions of Defendants were undertaken pursuant to, and/or were consistent with, policies, practices, customs, or usages of the City of Stamford and its Police Department.

100. Upon information and belief, the City of Stamford has failed to adequately train, supervise, and discipline its officers with respect to constitutional limits on searches, seizures, use of force, strip searches, and the use and handling of body-worn camera recordings.

101. This failure to train and supervise amounts to deliberate indifference to the rights of individuals, including Plaintiff, with whom officers come into contact.

102. The City of Stamford knew or should have known that, absent proper training and supervision, its officers would engage in unconstitutional conduct of the type described herein.

103. The violations of Plaintiff's rights were a direct and proximate result of these policies, practices, customs, and failures.

104. As a direct and proximate result of Defendants' conduct, Plaintiff suffered physical pain, emotional distress, humiliation, embarrassment, and invasion of privacy.

105. Plaintiff has suffered and continues to suffer damages, including but not limited to psychological trauma, loss of dignity, and other non-economic harms.

106. The conduct of Defendants was outrageous and egregious, justifying an award of punitive damages against the individual Defendants.

107. The events described herein did not occur in isolation. Approximately three months prior, Defendant Fedele was the only member to vote in favor of imposing significant penalties of approximately $17,000 against Plaintiff in a municipal fraudulent blight proceeding instigated by Santorella Jr. and advanced by his uncle Anti-Blight Officer Paul Zeiss, while all other members voted in favor of the Plaintiff.. Plaintiff alleges that the proceeding lacked a legitimate basis. Shortly thereafter, Plaintiff was subjected to the unlawful entry, arrest, and search described herein. Plaintiff alleges that these actions were part of a continuing course of targeted and retaliatory conduct involving the same individuals and closely connected actors, including members of the Santorella family.

108. At all times, defendant Fedele exercised ultimate supervisory authority and comprehensive control over the Police Department as a whole, including authority over hiring, discipline, promotion, compensation, pension and benefits, and all other terms and conditions of employment, thereby maintaining effective control over officers. Notwithstanding this authority, he failed to prevent, correct, or intervene in the misconduct described herein and permitted, condoned, and/or ratified such conduct.

109. Plaintiff is entitled to compensatory damages in an amount to be determined at trial.

110. Plaintiff is further entitled to punitive damages against the individual Defendants for their willful and reckless disregard of Plaintiff's constitutional rights.

111. Plaintiff is entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## V. COUNTS (CAUSES OF ACTION)

**COUNT I- Unlawful Entry and Search – Fourth Amendment** (42 U.S.C. § 1983)

112. Plaintiff repeats and realleges paragraphs 1 through 111 as if fully set forth herein.

113. Defendants entered Plaintiff's premises without a warrant, consent, or exigent circumstances.

114. This entry constituted an unreasonable search in violation of the Fourth Amendment.

115. As a direct and proximate result, Plaintiff suffered damages as described above.

**COUNT II- False Arrest / Unlawful Seizure – Fourth Amendment** (42 U.S.C. § 1983)

116. Plaintiff repeats and realleges paragraphs 1 through 115.

117. Defendants seized and detained Plaintiff without probable cause.

118. The seizure was unreasonable and in violation of the Fourth Amendment.

119. As a direct and proximate result, Plaintiff suffered damages.

**COUNT III- Excessive Force – Fourth Amendment** (42 U.S.C. § 1983)

120. Plaintiff repeats and realleges paragraphs 1 through 119.

121. Defendants used force that was objectively unreasonable under the circumstances.

122. The force used was excessive and violated Plaintiff's Fourth Amendment rights.

123. As a direct and proximate result, Plaintiff suffered damages.

**COUNT IV- Unlawful Strip Search and Bodily Intrusion – Fourth and Fourteenth Amendments** (42 U.S.C. § 1983)

124. Plaintiff repeats and realleges paragraphs 1 through 123 as if fully set forth herein.

125. Defendants subjected Plaintiff to a forced strip search and bodily intrusion without lawful justification or consent.

126. The search was conducted in a degrading, unreasonable, and excessively intrusive manner, including the exposure and recording of Plaintiff's naked body.

127. This conduct violated Plaintiff's rights to privacy, bodily integrity, and to be free from unreasonable searches under the Fourth and Fourteenth Amendments.

128. As a direct and proximate result, Plaintiff suffered damages.


**COUNT V — Failure to Intervene** (42 U.S.C. § 1983)

(Against Individual Defendants)

129. Plaintiff repeats and realleges paragraphs 1 through 128.

130. Defendants who observed the constitutional violations had a duty to intervene.

131. Defendants who observed or were aware of the unlawful seizure, fabrication, and suppression of evidence had a realistic opportunity to intervene, prevent or stop these violation.

132. They failed to do so.

133. Their failure to act renders them liable for the resulting constitutional deprivations.


**COUNT VI- – Municipal Liability – Monell Claim Against the City of Stamford** (42 U.S.C. § 1983)

134. Plaintiff repeats and realleges paragraphs 1 through 133.

135. The constitutional violations were caused by policies, customs, or practices of the City of Stamford.

136. The City further maintained, permitted, or was deliberately indifferent to practices involving the suppression, delayed disclosure, and/or pretextual denial of access to body-worn camera footage and other material evidence. The five-month withholding of exculpatory BWC footage in Plaintiff's case, combined with the use of knowingly false legal justifications to deny access, reflects a policy, practice, or custom of tolerating evidentiary suppression and failing to ensure integrity, transparency, and timely disclosure obligations.

137. Defendants Shaw, Conklin, and Fedele, in their supervisory capacities, knew or should have known of a pattern of misconduct, including prior complaints made to the department, they failed to properly respond to complaints and harassment reports, and failed to take corrective action. These Defendants failed to adequately train, supervise, and discipline officers under their command regarding constitutional limits on the use of force, arrests, searches, and retaliatory enforcement and and thereby effectively authorized, condoned, or acquiesced in the unlawful conduct described herein. They further created, enforced, or permitted policies, practices, or customs that allowed such misconduct to occur. This failure directly and proximately caused the violations of Plaintiff's constitutional rights.

138. Defendants acted in coordination with and/or in response to information provided by private individuals, without independent verification, and proceeded to take enforcement actions against Plaintiff without probable cause, as described above, including the prior fraudulent blight proceeding.

## COUNT VII – MALICIOUS PROSECUTION

(42 U.S.C. § 1983 – Fourth and Fourteenth Amendments)

139. Plaintiff repeats and realleges paragraphs 1 through 138 as if fully set forth herein.

140. Defendants initiated and continued criminal proceedings against Plaintiff.

141. Defendants continued the prosecution while in possession of materially exculpatory evidence that they intentionally withheld from Plaintiff.

142. The proceedings were initiated without probable cause.

143. Defendants acted with malice.

144. The proceedings terminated in Plaintiff's favor.

145. As a direct and proximate result, Plaintiff suffered damages, including deprivation of liberty, emotional distress, and reputational harm.

146. These include failures in training, supervision, discipline, and oversight.

147. The City's deliberate indifference led directly to the violations of Plaintiff's rights.

148. As a direct and proximate result, Plaintiff suffered damages.

## COUNT VIII — FABRICATION AND SUPPRESSION OF EVIDENCE / FALSE DENIAL

(42 U.S.C. § 1983 – Fourteenth Amendment)

149. Plaintiff repeats and realleges paragraphs 1 through 148 as if fully set forth herein.

150. Defendants were in possession of body-worn camera ("BWC") footage capturing the incident at issue. That footage contained an abundance of exculpatory evidence conclusively disproving the allegations against Plaintiff. It further contained even more extensive

incriminating evidence, including statements by the accusers themselves demonstrating fabrication, retaliatory motive, and coordination with law enforcement and judicial actors to initiate and pursue false claims against Plaintiff.

151. Plaintiff requested access to this footage through a formal Freedom of Information request.

152. In response, Defendant Burt Rosenberg, acting on behalf of the City, communicated and enforced the denial of Plaintiff's request and later asserting that the requested records were "erased by act of law" and not subject to disclosure.

153. Defendant Rosenberg reaffirmed this position on multiple occasions and further threatened Plaintiff with monetary sanctions to be imposed by the City of Stamford against the Plaintiff if she pursued legal recourse to obtain the records.

154. Despite the existence and known evidentiary value of this footage, Defendants withheld it for approximately five months. This prolonged suppression occurred with the participation and/or acquiescence of Plaintiff's then-counsel, depriving Plaintiff of timely access to evidence that would have immediately altered the course of the proceedings.

155. During this period, Plaintiff was forced to endure ongoing legal exposure, reputational harm, and significant personal distress while being denied access to evidence that would have exonerated and vindicated her at the outset. Instead, Plaintiff was only able to achieve that result approximately eighteen months later, after terminating multiple attorneys and proceeding pro se.

156. Upon information and belief, the delay in disclosure was not inadvertent. The duration and circumstances of the withholding raise serious concerns that Defendants used this period to control, limit, or otherwise manipulate the evidentiary record. Critically, independent footage captured by Plaintiff's Ring camera preserved key events that could not be altered or suppressed

—specifically, that Plaintiff opened the door, was asked for entry, and was then immediately seized and handcuffed. This independent recording directly contradicts the narrative advanced against Plaintiff and underscores the importance of the suppressed BWC footage.

157. Defendants denied Plaintiff's requests for the BWC footage under false pretenses. The initial denial was improper.

158. A subsequent denial invoked the so-called erasure statute, a justification that was knowingly false, inapplicable, and pretextual. At no time did Defendants provide a lawful basis for withholding the footage.

159. The asserted reliance on erasure was not a good-faith legal position, but a deliberate misrepresentation used to conceal material evidence. The footage was not only subject to disclosure obligations but constituted critical evidence that would have immediately exonerated Plaintiff while exposing misconduct by the accusers and the officials involved.

160. This suppression of materially exculpatory evidence, combined with the use of knowingly false legal justifications to deny access, deprived Plaintiff of due process and the ability to defend against false allegations.

161. It prolonged Plaintiff's harm unnecessarily and imposed a level of hardship that no innocent person should be subjected to within a system of justice.

162. Plaintiff was ultimately exonerated approximately eighteen months later, after terminating multiple attorneys and proceeding pro se—harm that would have been avoided had the BWC footage been timely disclosed.

163. Defendants' actions were willful, malicious, and in reckless disregard of Plaintiff's constitutional rights, including but not limited to rights secured under the Fourth and Fourteenth Amendments, and are actionable under 42 U.S.C. § 1983.

164. The integrity of the justice system depends on timely disclosure of truth, not its suppression. No individual should be forced to endure prolonged harm where exculpatory evidence exists from the outset.

165. As a direct result, Plaintiff was deprived of timely exculpation and subjected to prolonged legal proceedings that would not have occurred had the evidence been disclosed.

**COUNT IX – FIRST AMENDMENT RETALIATION** (42 U.S.C. § 1983)

166. Plaintiff repeats and realleges paragraphs 1 through 165 as if fully set forth herein.

167. Plaintiff engaged in constitutionally protected activity, including complaints and reports concerning Defendants' conduct.

168. Defendants took adverse action against Plaintiff, including arrest, prosecution, and related misconduct.

169. Defendants' actions were motivated by and substantially caused by Plaintiff's protected activity.

170. Defendants' conduct would deter a person of ordinary firmness from exercising First Amendment rights.

171. As a direct and proximate result, Plaintiff suffered damages.

**COUNT X– DENIAL OF RIGHT TO COUNSEL** (42 U.S.C. § 1983 – Sixth and/or Fifth Amendment)

172. Plaintiff repeats and realleges paragraphs 1 through 171.

173. Upon unlawful arrest and while in custody, Plaintiff requested an attorney. Defendants denied or ignored that request and continued questioning and processing.

174. Defendants' actions violated Plaintiff's constitutional right to counsel.

175. As a direct and proximate result, Plaintiff suffered damages

**COUNT XI– COERCIVE INTERROGATION / DUE PROCESS** (42 U.S.C. § 1983 – Fourteenth Amendment)

176. Plaintiff repeats and realleges paragraphs 1 through 175.

177. Defendants conducted questioning and custodial processing under coercive conditions, including during or immediately following a non-consensual strip search and after denying Plaintiff's request for counsel.

178. This conduct shocks the conscience and violates due process.

179. As a direct and proximate result, Plaintiff suffered damages

## VI. DAMAGES

180. Plaintiff repeats and realleges paragraphs 1 through 179.

181. As a direct and proximate result of Defendants' conduct, Plaintiff suffered loss of liberty, severe emotional distress, psychological trauma, and physical manifestations thereof, including the relapse of a chronic medical condition that Plaintiff has endured since adolescence for approximately forty years. For the twenty years preceding the incident, the condition had

remained stable, well-controlled with medication, and relapse-free, but has relapsed under the acute and sustained stress caused by Defendants' actions and the events that followed.

182. Plaintiff has experienced persistent stress-related symptoms, including cardiovascular distress, elevated blood pressure, neurological symptoms, and cognitive impairment.

183. Plaintiff suffered substantial interference with, and effective destruction of her livelihood, including disruption of her professional practice, loss of income, and damage to her professional reputation and standing, including present and prospective reputational harm.

184. Plaintiff experienced substantial disruption to her daily functioning, professional capacity, and ability to safely perform critical duties, resulting in loss of income, loss of business opportunities.

185. Plaintiff has further suffered loss of enjoyment of life, and ongoing fear, anxiety, and trauma, including a persistent and well-founded fear and distrust of local and state police, city officials, and judges, affecting her daily functioning and sense of personal safety.

186. Plaintiff no longer feels safe in her own home, in public, or while driving, and experiences ongoing fear of law enforcement based on her direct experience of Defendants' conduct under color of law.

187. These injuries are ongoing and have caused lasting and potentially permanent harm to Plaintiff's health, well-being, and future.


## CONCLUSION

In our nation, founded on the rule of law, freedom and security from unlawful seizure, fabricated allegations, and malicious prosecution are not luxuries—they are fundamental guarantees

secured by the Constitution of the United States. No law-abiding individual may be subjected to the deprivation of liberty based on false pretenses in a system committed to justice and the rule of law.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff and against all Defendants;

B. Award compensatory damages in an amount to be determined at trial;

C. Award punitive damages against the individual Defendants;

D. Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

E. Award pre-judgment and post-judgment interest as permitted by law;

F. Grant such declaratory and/or injunctive relief as the Court deems just and proper;

G. Grant such other and further relief as the Court deems just and proper.

## VIII. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Plaintiff proceeds pro se.

Plaintiff is not an attorney and English is not her first language.

Plaintiff's allegations are based on facts, evidence in her possession, and personal knowledge, and Plaintiff seeks to have these claims determined by a jury.

Respectfully,

Dr. Natalie Levitt

Plaintiff, Pro Se

36 Arcadia Rd., Unit #558

Old Greenwich, CT 06870

203-570-7387

natalievmd@gmail.com